UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
UNITED STATES OF AMERICA        )
                                )
        v.                      )     Docket No. 03-cr-10087-NG
                                )
RAMSES SMITH,                   )
        Defendant.              )
_____ )
GERTNER, D.J.

MEMORANDUM AND ORDER RE: MOTION TO SUPPRESS
May 8, 2006

I.   INTRODUCTION

     The defendant, Ramses Smith, has moved to suppress testimony

by Agent Christopher Demlein of the Bureau of Alcohol, Tobacco,

and Firearms ("ATF") identifying him as a participant in the

illegal sale of a firearm and ammunition.  Specifically, Smith

seeks to exclude an out-of-court photo identification made by

Agent Demlein, as well as Agent Demlein's identifications of

Smith during his detention hearing and a hearing on his motion to

suppress.  Smith also moves to suppress any future in-court

identification that Agent Demlein might make.

     Courts have long acknowledged the centrality of

identification evidence in the government's case in chief, as

well as the due process dangers it presents.  As a result,

identification procedures must be carefully reviewed to see if

they are suggestive, and if subsequent identifications are

tainted by earlier, distorted processes.  Plainly, the

counterpart of courts' obligation is the obligation of the

government, and the law enforcement agents it uses, to monitor identification procedures, to keep accurate records of them, and obviously, to testify truthfully.

Sadly, I find that the ATF agent in this case failed to meet any of these obligations – including the obligation to tell the truth.

I held a multi-part suppression hearing on January 27, 2005 and February 16, 2006.  As a result of this hearing, and the fundamental, troubling problems in the government's case it revealed, I hereby **GRANT** defendant's motion to suppress [docket entry #25] the out-of-court photo identification, the identifications during the detention and suppression hearings, and any future in-court identification by Agent Demlein of Ramses Smith.

## II.   <u>FACTUAL BACKGROUND & PROCEDURAL HISTORY</u>

### A.   <u>The Gun Transaction</u>

Defendant Ramses Smith was indicted on April 2, 2003 for possession of a firearm and ammunition by a convicted felon.  The allegations against him stem from a midday sting operation on January 28, 2002, in which ATF Agent Demlein, working undercover, and a cooperating witness ("CW") purchased a firearm and ammunition from three or four men.

Agent Demlein and the CW had made arrangements with one of the men, John Ivory, to purchase the gun, and drove in the CW's

car to a McDonald's parking lot in the Roxbury neighborhood of Boston to complete the transaction.  Agent Demlein wore a video recorder on the lapel of his jacket, and the CW's car was wired for audio.  In addition, multiple Boston Police officers, members of the Youth Violence Strike Force, were stationed in and around the parking lot, listening in on the gun sale.

Two men entered the CW's car and negotiated the sale.[1] Demlein was familiar with one of the men, Paul Cato, but did not recognize the other.  The government alleges that the defendant, Ramses Smith, was that unknown man, ultimately identified by Agent Demlein from a photograph two months later under what can be most charitably described as troubling circumstances.[2]

Despite two police reports by Agent Demlein, his grand jury testimony, his testimony at the defendant's detention hearing, and his testimony during the hearing on the defendant's motion to suppress, the sequence of events between the gun transaction and the photo identification of Smith remains obscure.  Indeed, over the course of these proceedings, Agent Demlein has offered *four different accounts* of his out-of-court photo identification of Ramses Smith.  His credibility is doubtful.

---

[1] The remaining men or man remained in the parking lot.  (Det. Hr'g Tr. 9, 10-17, Dec. 5, 2003).

[2] Neither the audio nor the video recording revealed the identity of the unknown man.  (Det. Hr'g Tr. 32, 3-8, Dec. 5, 2003).

B.   **Police Reports**

The first account of the photo identification is found in two police reports that Agent Demlein wrote in the months following the gun sale.

The report, written by Demlein on January 30, just days after the transaction, and approved by his supervisor on February 4, 2002, gives a chronological narrative of the January 28, 2002 gun sale and the subsequent activities of Agent Demlein, the CW, and the police officers who monitored the sale.  He writes that he and the CW met *three* men in the McDonald's parking lot: John Ivory, Paul Cato, and an unknown man.  The unknown man is described only as a "black male, medium-dark complexion, approximately 24 [years of age], 6'3", 200 pounds. . . . called "ribs or rizz. . . ."  (Suppr. Hr'g, Gov't Exh. 2, Jan. 27, 2005).  The report ends with a description of the audio and video equipment used to record the gun transaction and a notation that the firearm and ammunition purchased by Agent Demlein would be stored in the police vault.  It contains no reference to any efforts by the Boston Police, the CW, or Agent Demlein to identify the unknown man, nor any of the additional details of the man's physical description that surfaced in later accounts.

In a second police report written by Agent Demlein a month later, on March 19 and approved on March 27, 2002, Demlein describes a meeting with Boston Police Detectives Susan Antonucci

and Marvin Wright.  He relates that on March 13, 2002, he and the
CW who participated in the January 28 gun transaction "were shown
a photograph of Ramses M. Smith . . . [and both] identified the
individual as the subject who sold [Agent] Demlein a .357 Smith
and Wesson Revolver one month prior."  (Suppr. Hr'g, Gov't Exh.
3, Jan. 27, 2005).

From these two police reports, the following picture emerges
of the January 28, 2002 transaction and subsequent events: 1)
three men were present in the McDonald's parking lot; 2) one of
them, called Ribs or Rizz, was unknown to Agent Demlein; 3) Agent
Demlein identified that man as Ramses Smith from a single photo,
two months after the encounter, on March 13, 2002.

### C.  <u>Grand Jury</u>

When he testified before the grand jury on April 2, 2003,
however, Agent Demlein's story changed.  This time, he testified
that *four* men, not three, were present in the McDonald's parking
lot, now including John Ivory's cousin Shon Jakes. (Grand Jury
Tr. 7, 9-17, Apr. 2, 2003).  The unknown fourth man, called
"Ribs" or "Riz," was "very tall, six, bigger than six-feet tall.
For the first time, nearly four months after the fact, Demlein
described this man as having "*a black and blue leather jacket on,
short cropped, maybe corn rows, medium complexion, medium to dark
complexion*, over 200 pounds, a black male, early twenties or mid
twenties."  <u>Id.</u> at 7, 20-24; 10, 2-3 (emphasis added).

In addition, in this testimony Agent Demlein placed the photo showup just after the initial transaction, rather than over a month later.  He testified that, upon returning to the police station after the gun transaction on January 28, one of the Boston Police officers "pulled up a photo of who he thought the [unknown fourth man] was, and instantly we recognized who the individual was."  Id. at 13, 22-24.  Agent Demlein stated that the individual in this photo was Ramses Smith.

Agent Demlein's grand jury testimony, then, provides a second version of events: 1) four, instead of three, men were present in the McDonald's parking lot; 2) one of them, called Ribs or Rizz, was unknown to Agent Demlein; 3) Demlein, along with multiple Boston Police officers, identified that man as Ramses Smith from a single photograph hours, rather than months, after the transaction, on January 28, not March 13, 2002; 4) for the first time, Agent Demlein's physical description of the man contained a reference to the man's "black and blue leather jacket" and his "short cropped hair," perhaps in "corn rows."

### D.  **Detention Hearing**

At Ramses Smith's December 5, 2003 detention hearing, Agent Demlein testified to yet another version of his story.  Again, he recounted seeing four men in the McDonald's parking lot, one of whom he did not know and whom Paul Cato called "Rizz" or "Ribs." (Det. Hr'g Tr. 7, 12-15; 8, 23-24, Dec. 5, 2003).  Again, he

characterized the man's jacket and gave a physical description:
He was "wearing a distinctive . . . black and blue leather Avirex
jacket." He was "[a] large 200 pounds -- a tall, very tall, over
6'2" or so, over 200 pounds, medium/dark complexion, short hair."
Id. at 29, 21-25.

What is new – and troubling – about the detention hearing
version of Demlein's story is that he now testified, for the
first time, that after the gun sale on January 28, 2002, he and
Boston Police officers reviewed the video taken in the car but
could not identify the unknown man.  Id. at 15, 14-15.  Demlein
also testified that he participated in an elaborate photo
identification proceeding, far more elaborate than anything
described before.  Officers showed Agent Demlein "two or three"
photos, although the exact number was unclear-- fewer than "a
hundred," though perhaps only one-- and Demlein was able to
identify Ramses Smith's photo as the unknown man.  Id. at 16, 2-
19.[3]  He was "a hundred percent sure" about this identification.
Id. at 16, 25.

Demlein testified to this level of certainty despite also
admitting that his vantage point for observing the unknown man

---

[3] Agent Demlein was asked, "Do you remember how many photos you looked
at before identifying him, was it just one, more than one?"  He replied, "I
don't recall, I don't recall.  It may have been -- it wasn't like a hundred.
At the most, it was two or three.  There may have just been one photo."  Id.
at 16, 2-10.  The testimony was stunning. Quite apart from the multiple
versions of what happened during the identification procedure, and the
obvious credibility issues, Agent Demlein's affect was almost cavalier, as if
the constitutional standards were somehow irrelevant to him.

was restricted.  He stated, "I could just kind of acknowledge him out of the side of my eye," and testified further that his attention was not trained on the unknown man, but rather that he "stayed focused on the man with the gun [Paul Cato] in the back seat." Id. at 14, 25-25; 34, 2.

During the detention hearing, Agent Demlein also made an in-court identification of Ramses Smith as "the person that [he] saw seated behind [him] during that transaction on January 28 . . . ." Id. at 18, 13-23.

In effect, Agent Demlein's detention hearing testimony presents the third version of the January 28, 2002 gun sale and subsequent photo identification of Ramses Smith: 1) four men were present in the McDonald's parking lot; 2) one of them, called Ribs or Rizz, was unknown to Agent Demlein; 3) Agent Demlein identified that man on January 28, 2002 as Ramses Smith from what was now described as a multi-photo array following a review of video footage; 4) Agent Demlein's physical description of this man omitted his earlier reference to "short cropped hair" or "corn rows," but now included the detail that the man's jacket was "distinctive," and that it was made by "Avirex."

**E.   Suppression Hearing**

At the January 27, 2005 hearing on the defendant's motion to suppress, I heard yet another version of Demlein's story.  Like the previous versions presented to the grand jury and at the

detention hearing, Agent Demlein's suppression hearing testimony was made under oath.

Agent Demlein again placed four individuals in the McDonald's parking lot, one of whom was called "Ribs" or "Riz." (Suppr. Hr'g Tr. 9, 8-9; 12, 8-12, Jan. 27, 2005).  This unknown man was "very tall, 6-3 foot tall, medium dark complexion, black male, mid-20's . . . not heavy set but broad build, like 200 pounds plus." Id. at 18, 11-14.

Agent Demlein described his effort to identify this unknown man.  He testified that, after the gun transaction on January 28, 2002, he returned to the police station.  There, he was shown "several photos," but conceded that could not identify the unknown man.  Id. at 19, 4-22.  This account contradicts Demlein's detention hearing testimony, according to which he made an identification on January 28, 2002 and was "a hundred percent sure." (Det. Hr'g Tr. 16, 25, Dec. 5, 2003).

Now, mixing in the version of events contained in his police reports, Agent Demlein testified that he returned again to the police station on March 13, 2002, and was shown a single photo by Boston Police Detective Marvin Wright.  He identified the man in the photo, Ramses Smith, as "the individual that sold me a gun about a month ago with Paul [Cato]." Id. at 22, 11-12.  He testified that he was "100 percent certain" about this identification.  Id. at 23, 14.

Agent Demlein also identified Ramses Smith during the suppression hearing as the person he had previously identified from a photograph.  Upon pointing out Smith in court, he remarked that he was "100 percent [certain] that's him," "the same as I was then."  Id. at 47, 18-24.

Boston Police Detective Marvin Wright testified at the suppression hearing.  He explained that he had stopped Ramses Smith on the street on February 1, 2002 because he fit Agent Demlein's initial description of the unknown man: "a black male, dark skin, approximately 6'3" wearing an Avirex jacket."  Id. at 73, 18-19.[4]  Detective Wright testified that he pulled Smith's photo and later showed it to Agent Demlein, who identified Smith as the unknown man from the January 28, 2002 gun sale.  Id. at 76, 17-20; 77, 1-5, 14-21.[5]

This, then, is version number four, returning to some of the themes from earlier versions: 1) four men were present in the McDonald's parking lot; 2) one of them, called Ribs or Rizz, was unknown to Agent Demlein; 3) Agent Demlein first failed to identify this unknown man from a multi-photo array shown to him on January 28, 2002; 4) Agent Demlein ultimately identified

---

[4]The "Avirex" detail, however, was in none of Demlein's written reports, or his grand jury testimony. It appeared for the first time at the detention hearing, which was obviously after the February 1, 2002. stop by Detective Wright.

[5] Wright testified that he did not remember the exact date on which he showed the photo to Demlein.  Id. at 77, 3-5.

Ramses Smith from a single photo shown to him by Detective Wright on March 13, 2002.

### F.   Reconstruction of the Photo Array & Continuation of the Suppression Hearing

Seriously troubled by what I had heard at the January 2005 suppression hearing, I ordered the government to produce Detective Wright's field interrogation/ observation report ("FIO") from his February 1, 2002 stop of Ramses Smith and a copy of the photographs shown to Agent Demlein on January 28 and March 13, 2002.

On February 14, 2005, the government produced Detective Wright's FIO,[6] but explained in a letter that none of the photos shown to Agent Demlein, apart from that of Ramses Smith, can now be located.  (Gov't Letter & FIO, Feb. 14, 2005).  According to the government, the photos were printed from a Boston Police database at the time they were shown to Agent Demlein.  The government, however, cannot provide either the original photo printouts or a record of the photos that were selected from the database on either January 28 or March 13, 2002.[7]

---

[6] The FIO does not shed any light on the confused and contradictory nature of the identification testimony.  It merely describes a dark-complected black man, age 23, 6' 6", 235 pounds, with a goatee and mustache, wearing a blue and green leather Eagles jacket.

[7] Though the government identified a single photo of one Lamar Tillery printed on January 29, 2002 by a member of the Youth Violence Strike Force, no photos were printed on either January 28 or 29, 2002 using Detective Wright's identification number or the identification numbers of the other detectives working on the gun sale investigation.  According to the government, if any of those detectives printed photos on January 28 or 29, 2002, there would be a record in the system.  The government also indicates, however, that detectives

I allowed the suppression hearing to continue so that the parties could address this new information.  By the end of the second day of the suppression hearing on February 16, 2006, however, the record was no clearer.  The government had presented four different versions of Agent Demlein's out-of-court photo identification of Ramses Smith as the unknown third (or fourth) participant in the gun sale, to wit: 1) Agent Demlein's two police reports mention only the March 13, 2002 single-photo identification.  2) His grand jury testimony refers to a single-photo identification on January 28, 2002 and describes multiple Boston police officers' making the identification as well.  3) At the detention hearing, Agent Demlein testified that he made the identification of Ramses Smith, allegedly from a multi-photo array after also reviewing video footage, on January 28, 2002. 4) Finally, at the suppression hearing, Agent Demlein recounted an initial, failed attempt to identify the unknown man from a multi-photo array on January 28, 2002 and a subsequent "successful" identification of Ramses Smith from a single photo on March 13, 2002.  The government cannot reconstruct any of the photo arrays about which Agent Demlein testified, and therefore cannot corroborate any of these four versions of events.

---

frequently print photos while other detectives are logged into the photo database.  Therefore, other photos could have been printed on January 28, 2002 under different detectives' names, but the government has no way of retrieving them without the name of the individual logged into the system or the name of whomever appeared in the photo.  In the case at bar, the government has neither piece of information and, as a result, cannot locate any of the photographs shown to Agent Demlein.

The constitutionality of an out-of-court identification pivots on the procedures the police employed.  It is hard to imagine a moment in which careful record-keeping and accurate reconstruction could be more important.  But instead of care and accuracy, the government has offered nothing but chaos and contradiction.  Indeed, after picking my way through the underbrush of these contradictions, only one thing is clear: The procedure employed to produce the out-of-court identification of Ramses Smith was unconstitutionally suggestive and unreliable. Agent Demlein's accounts "evolved," to put it mildly, as it became clear the procedures would be challenged and that earlier versions were suspect. While the circumstances of Agent Demlein's identifications of Ramses Smith during the detention and suppression hearings-- made on the record and in open court-- are more clear, they are plainly a product of the earlier suggestive identification and no less flawed.

**III. <u>ANALYSIS</u>**

    **A.   <u>Legal Standard</u>**

The standard for determining whether to suppress testimony concerning both out-of-court and in-court identifications is "that of fairness as required by the Due Process Clause of the Fourteenth Amendment." <u>Manson v. Brathwaite</u>, 432 U.S. 98, 113 (1977).  If the defendant is able to show "a very substantial likelihood of irreparable misidentification," then the evidence

should be excluded.  Id. at 116; see also United States v. McLain, No. 94-3192, 1995 U.S. App. LEXIS 12955, at *9-*10 (6th Cir. 1995) (noting that the burden rests on the defendant to demonstrate that a police identification procedure was improper).

Courts evaluate the fairness of out-of-court and in-court identifications using a two-step inquiry.  United States v. de Jesus-Rios, 990 F.2d 672, 677 (1st Cir. 1993).  First, a court must determine whether the identification procedure was impermissibly suggestive.  Id. at 677.  If the procedure was not impermissibly suggestive, the analysis is over and defendant's motion to suppress is denied.  If, however, the defendant establishes that the procedure *was* impermissibly suggestive, the court must decide whether the identification was nevertheless reliable under the totality of the circumstances.  Id.  In assessing reliability, courts traditionally consider five factors:

> 1) the witness's opportunity to view or observe the defendant;
>
> 2) the witness's degree of attention;
>
> 3) the accuracy of the witness's description of the defendant;
>
> 4) the level of certainty demonstrated by the witness at the identification;
>
> 5) the length of time between the crime and the identification.

Manson, 432 U.S. at 114; Neil v. Biggers, 409 U.S. 188, 199-200 (1972); de Jesus-Rios, 990 F.2d at 677.  It is not necessary that all five indicia of reliability be present; they are to be examined together as part of the court's "totality of the circumstances" inquiry.  de Jesus-Rios, 990 F.2d at 677-78.

This two-step analysis applies with equal force to identifications made, as here, by police officers or other government agents, who are presumably better trained than civilians in the processes of observation and recollection.  To the extent that courts take into account a police officer or government agent witness' heightened powers of observation, they do so in connection with the second Manson factor: the witness' degree of attention.  In fact, Manson itself concerned a police officer's out-of-court identification of a drug suspect from a single photo.  432 U.S. at 108 (commenting that the police officer, "as a specially trained, assigned, and experienced officer, . . . could be expected to pay scrupulous attention to detail").

In dissent, Justices Marshall and Brennan were less convinced of the reliability of police and government agent witness' observations.  The dissenters remarked:

> [B]oth common sense and scholarly study indicate that while a trained observer such as a police officer 'is somewhat less likely to make an erroneous identification than the average untrained observer, the mere fact that he has been so trained is no guarantee that he is correct in a specific case.  His

identification testimony should be scrutinized just as
carefully as that of the normal witness.'  Moreover,
'identifications made by policemen in highly
competitive activities, such as undercover narcotic
agents . . ., should be scrutinized with special care.'

Id. at 130 (internal citations omitted).

In cases involving identifications by police officers, the
First Circuit has treated officers' testimony as Justices Brennan
and Marshall suggested, "as that of a normal witness."  See,
e.g., United States v. Lopez-Lopez, 282 F.3d 1, 10 (1st Cir.
2002) (upholding the admission of police officers' identification
of drug distribution suspects without reference to the officers'
heightened observation skills).

It falls to this Court, therefore, to examine both the
suggestivity of the identification procedures employed in this
case and, if suggestive, the reliability of the identifications
that resulted.  To the extent that Agent Demlein's arguably
heightened observation skills are relevant, I will consider them
in connection with the second Manson factor.

A final note: Though courts generally analyze both out-of-
court and in-court identifications using the same two-step
inquiry described above, the analysis differs slightly in cases
where a witness' in-court identification follows an out-of-court
identification achieved using an improperly suggestive procedure.
In such cases, courts have expressed concern that the later in-
court identification would be tainted by the earlier, improper,

-16-

out-of-court identification.  <u>Simmons v. United States</u>, 390 U.S.
377, 383-84 (1968) ("Regardless of how the initial
misidentification comes about, the witness thereafter is apt to
retain in his memory the image of the photograph rather than of
the person actually seen, reducing the trustworthiness of
subsequent lineup or courtroom identification.").  An in-court
identification of this type may nevertheless escape suppression
if the court determines that the in-court testimony is somehow
reliable despite the suggestiveness of the earlier identification
procedure.  In the First Circuit, the touchstone of this analysis
is the question of whether the earlier out-of-court
identification "has proven so impermissibly suggestive" as to
vitiate the reliability of the later in-court identification and
"give rise to a very substantial likelihood of
misidentification."  <u>United States v. Maguire</u>, 918 F.2d 254, 264-
65 (1st Cir. 1990) (citing <u>Simmons</u>, 390 U.S. at 384).[8]

Thus, in the case at bar, I will apply the two-step test to
the three identifications at issue (out-of-court, detention
hearing, and suppression hearing), inquiring into both
suggestivity and reliability.  When examining the in-court

---

[8] In addition, in cases where an in-court identification follows an out-of-court identification procedure that was only *minimally* suggestive, the First Circuit has considered whether this suggestivity could be "cured at trial" through cross-examination.  <u>de Jesus-Rios</u>, 990 F.2d at 678; <u>see</u> <u>also</u> <u>Maguire</u>, 918 F.2d at 264 ("We are content to rely upon the good sense and judgment of American juries . . . . Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable features.") (citing <u>Manson</u>, 432 U.S. at 116).

identifications Agent Demlein made at the detention and
suppression hearings, I will consider whether their reliability
has been undermined by the earlier, out-of-court photo
identification procedure.  I will then address the question of
additional future in-court identifications.

###    B.    The Out-of-Court Photo Identification

Despite the contradictions in Agent Demlein's four accounts
of his photo identification of Ramses Smith, the common thread
connecting them all is that he made the identification from a
single photo.[9] As for the timing of the photo identification,
despite Agent Demlein's grand jury and detention hearing
testimony that he identified Ramses Smith on January 28, 2002,
right after the gun transaction, I find that the identification
in fact took place two months later on March 13, 2002.  This
conclusion is supported by Detective Marvin Wright's testimony,
as well as the description of the March 13 photo identification
in Agent Demlein's March 19, 2002 police report and the absence
in his January 30, 2002 report of any reference to identification
attempts on that day.

I also find that, despite testimony about multiple
identification attempts, the *only* time Agent Demlein viewed
photos and attempted to identify the unknown participant in the

_____

[9]Even his detention hearing testimony, in which he stated that he might
have reviewed "two or three" photos on January 28, 2002, does not preclude the
possibility that he viewed only one.  Indeed, he conceded, "There may have
been just one photo."  (Det. Hr'g Tr. 16, 8-10, Dec. 5, 2003).

gun transaction was on March 13, 2002, when he was shown a single
photograph.  This conclusion is consistent with Detective
Wright's suppression hearing testimony that he did not recall
showing any photos to Agent Demlein on January 28, 2002.[10]
(Suppr. Hr'g Tr. 80, 13-19, Jan. 27, 2005).  It is also bolstered
by the lack of any record of photos printed on January 28, 2002
by the detectives working on the gun sale investigation and the
absence of any reference to a January 28 identification attempt
in Agent Demlein's January 30 and March 19, 2002 police reports.

     Having stilled the moving target of Agent Demlein's
identification-related testimony, I now proceed to the two-step
suggestivity and reliability analysis.

          1.  __Suggestivity__

     It is axiomatic that identifications achieved through the
use of a single photo are highly problematic.  A single photo
shown to an eyewitness (the proverbial "Is this the man you saw?"
question) plainly suggests the guilt of the person pictured.  As
the First Circuit has commented, "[s]ingle photo identifications
do, indeed, present so serious a danger of suggestiveness as to
require that they be given extremely careful scrutiny . . . ."
__Nassar v. Vinzant__, 519 F.2d 798, 801 (1st Cir. 1975); __see also__

_____

     [10] Detective Wright's testimony that Agent Demlein remarked on March 13,
2002 that Ramses Smith was "the guy that [he] couldn't ID" does not
necessarily refer to an earlier identification attempt, but more likely refers
to the fact that the third (or fourth) participant in the gun transaction was
unknown to Agent Demlein.  (Suppr. Hr'g Tr. 77, 20-21, Jan. 27, 2005).

United States v. Gomez Pizarro, 364 F. Supp. 2d 56, 67 (D.P.R.
2005) (suppressing testimony concerning a single-photo
identification on the ground of its suggestivity); United States
v. Shay, No. 92-10396, 1993 U.S. Dist. LEXIS 9169 (D. Mass. June
29, 1993) (same).  The Supreme Court has held similarly that
"identifications arising from single-photograph displays may be
viewed in general with suspicion." Manson, 432 U.S. at 116
(citing Simmons, 390 U.S. at 383).  The Manson court ultimately
determined that the single-photo identification procedure
employed in that case was not impermissibly suggestive, noting
that the police officer witness was given an opportunity to view
the single photo "at his leisure," alone and outside the presence
of other officers.  432 U.S. at 116.

In the case at bar, the single-photo identification
procedure used to achieve Agent Demlein's identification of
Ramses Smith on March 13, 2002 was impermissibly suggestive.  In
contrast to Manson, Agent Demlein was not alone when viewing the
photo.  He was in Detective Wright's presence and, if his March
19, 2002 police report is to be believed, in the presence of
Detective Antonucci as well.  Moreover, though Detective Wright
testified at the suppression hearing that he merely asked Agent
Demlein, "Does this guy look familiar to you?", Agent Demlein had
discussed the gun investigation and described the unknown man to
Detective Wright prior to March 13.  (Suppr. Hr'g Tr. 77, 14-18;

73, 3-19, Jan. 27, 2005).  He was clearly aware that Detective
Wright had been looking for the unknown man he had generally
described.  He surely knew who the "guy" in Detective Wright's
single photo might be.[11]

Agent Demlein's March 13, 2002 identification of Ramses
Smith from a single photo was therefore the result of an
impermissibly suggestive procedure.  The next step in the
analysis requires that I examine, under the totality of the
circumstances, whether the identification was nevertheless
reliable.

### 2.  Reliability

Though it is incongruous to discuss "reliability" when the
government's main witness has contradicted himself to such an
extent, this Court will nevertheless proceed through the five
reliability factors set out by the Manson Court.

### a.  Opportunity to Observe

At the suppression hearing, Agent Demlein testified that the
gun transaction occurred sometime shortly after noon on January

---

[11] Even if I were to ignore the contradictions in Agent Demlein's
accounts of the identification and credit his testimony that he viewed
additional photos prior to March 13, 2002, my conclusion regarding
suggestivity would remain the same.  The First Circuit has noted that, when a
witness first views multiple photos and is later shown a single photo, an
identification achieved as a result of the single-photo viewing may not be
impermissibly suggestive, as that viewing is "to some extent a continuation of
an ongoing process of looking through police photos." Nassar, 519 F.2d at
801.  The court noted, however, that this "continuation" theory only reduces,
but does not eliminate, "the suggestive force" inherent in single-photo
identification procedures.  Id.  This is especially so when the witness cannot
make an identification from the earlier multiple-photo array.

28, 2002.  (Suppr. Hr'g Tr. 7, 5-7, Jan. 27, 2005).  He described
the day as "bright."  Id. at 20, 1-4.

Agent Demlein's position in the car, however, severely
limited his opportunity to observe the unknown man, who was
sitting directly behind him in the rear passenger's seat.  Id. at
12, 13-16.  In fact, Agent Demlein testified at the detention
hearing that he could only "kind of acknowledge" this man "out of
the side of [his] eye."  (Det. Hr'g Tr. 14, 24-25, Dec. 5,
2003).[12]  Finally, Agent Demlein testified at the suppression
hearing that the unknown man was in the car for a mere forty-five
seconds.  (Suppr. Hr'g Tr. 59, 4-20, Jan. 27, 2005).[13]

Despite the hour and the brightness of the day, then, Agent
Demlein's opportunity to observe the unknown man was limited by
both his own position in the front seat and the length of time
the man stayed in the back seat.

**b.   Degree of Attention**

Though Agent Demlein is a trained ATF agent, and is
presumably more skilled than the average observer in studying

---

[12] Agent Demlein later gave contradictory testimony, stating that he
could, in fact, observe the unknown man.  He testified at the suppression
hearing, "Actually I paid attention to both [Paul Cato and the unknown man].
[The unknown man] was more the imposing person in the back seat so I really
wanted to keep an eye on him as well."  (Suppr. Hr'g Tr. 50, 13-15, Jan. 27,
2005).

[13] Though it is possible that Demlein could have had an opportunity to
observe the unknown man before he entered the car and after he exited, the
testimony on this point is confused.  It appears that, because he was focused
primarily on Paul Cato, the man with the gun in the backseat of the car,
Demlein did not have an opportunity to observe the unknown man outside the car
or pay very close attention to him.  (Suppr. Hr'g Tr. 60, 25; 61, 1-3, Jan.
27. 2005; Det. Hr'g Tr. 34, 20-25, Dec. 5, 2003).

those around him, he clearly was not able to use those skills in
the case at bar.  Agent Demlein testified at the detention
hearing that he "stayed focused on the man with the gun in the
back seat," rather than on the unknown man.  (Det. Hr'g Tr. 34,
2, Dec. 5, 2003).  He was attuned to the danger of being shot,
and therefore fixed his attention on Paul Cato, who had the gun
and was negotiating its sale.  (Suppr. Hr'g Tr. 20, 15-22, Jan.
27. 2005; Det. Hr'g Tr. 34, 1-2, Dec. 5, 2003).  He hardly
exercised the special training that so impressed the Manson
court, and surely did not pay close attention to the unknown man.

### c.   **Accuracy of the Description**

Though Agent Demlein's description of the unknown man
changed slightly over time, particularly with respect to the
man's hairstyle and jacket, it remained relatively consistent.
It also fits Ramses Smith, at least as Detective Wright observed
him on February 1, 2002 and as he was pictured in the single
photo shown to Agent Demlein on March 13, 2002.  (Suppr. Hr'g,
Gov't Exh. 1, Jan. 27, 2005; Gov't Letter & FIO, Feb. 14, 2005).

The greater concern here, however, is the description's
extraordinary level of generality.  The description was so broad
as to encompass "hundreds of individuals." (Suppr. Hr'g Tr. 83,
3-6, Jan. 27, 2005).  Indeed, Smith's attorney, at the
suppression hearing, raised the possibility that Agent Demlein's
description in fact fit Paul Cato more accurately than Ramses

-23-

Smith.  Id. at 60, 9-15; 64, 16-19.  The nicknames "Rizz" or
"Ribs," though they share the first letter "R" with "Ramses," are
not distinctive enough to make this broad description more
specific, and there has been no testimony regarding Smith's
nickname, if he has one at all.

Thus, though Agent Demlein's description of the unknown man
appears to fit Ramses Smith at the time he was stopped and later
identified, its breadth limits its use in this analysis.

### d.   <u>Level of Certainty</u>

Agent Demlein testified at both the detention and
suppression hearings that he was one hundred percent certain that
the man he identified on March 13, 2002 was the unknown third (or
fourth) participant in the gun sale.  (Suppr. Hr'g Tr. 16, 25,
Jan. 27, 2005; Det. Hr'g Tr. 23, 14, Dec. 5, 2003).  He did not
contradict himself on this point.  The shifting sands of his
testimony, however, in nearly every other respect, makes this
statement less than credible.

### e.   <u>Length of Time Between Crime and Identification</u>

Almost two months elapsed between the date of the gun
transaction and the photo identification.  During that time,
Agent Demlein testified that he was working at the Olympics in
Salt Lake City, Utah.  (Suppr. Hr'g Tr. 47, 10-17, Jan. 27,
2005), on scores of other cases.

The two month period between the gun transaction and Agent Demlein's viewing of the single photograph reduces the reliability of Agent Demlein's identification.  Indeed, in Manson, the Court found a photo identification reliable when it occurred "within minutes of the crime," commenting, "[w]e do not have here the passage of weeks or months between the crime and the viewing of the photograph."  432 U.S. at 115; but see Levasseur v. Pepe, 70 F.3d 187, 195 (1st Cir. 1995) (finding an identification reliable despite a six-month lapse between the crime and the identification because the strength of the other indicia outweighed the effect of the time lapse).

### 3.    Conclusion: The Out-of-Court Photo Identification

Considering the totality of the circumstances, I conclude that Agent Demlein's single photo out-of-court identification of Ramses Smith was unreliable.  The combination of Agent Demlein's limited opportunity to observe the unknown man, his relative inattention, his broad description of the man, and the two-month time lapse between the gun sale and the identification destroys the identification's reliability.

### C.    The Detention and Suppression Hearing Identifications

My conclusion that Agent Demlein's out-of-court photo identification of Ramses Smith was both suggestive and unreliable does not necessarily require suppression of the two in-court identifications of Smith as well.  Those identifications must

only be suppressed if the suggestiveness of the earlier photo identification procedure vitiates the reliability of any later identification, if the previous identification "has proven so impermissibly suggestive" as to "give rise to a very substantial likelihood of misidentification." Maquire, 918 F.2d 254, 264-65 (1st Cir. 1990) (citing Simmons, 390 U.S. at 384).  I may also consider the curative power of cross-examination.  de Jesus-Rios, 990 F.2d at 678.

In the case at bar, I can find nothing in the record that would suggest that Agent Demlein's two in-court identifications were free of the taint of the earlier, suggestive photo identification.  Agent Demlein provided no additional testimony showing that his in-court identifications were made on a more reliable basis than the earlier photo identification.  In fact, Demlein admitted that he had not seen the unknown man before, and never saw him again after, the gun transaction.  (Det. Hr'g Tr. 25, 1-7, Dec. 5, 2003).  If anything, Demlein's ability to identify the unknown man was significantly weaker at the detention hearing, nearly *two years* after the gun sale, and even more so at the suppression hearing, almost *three years* after the gun transaction.  In addition, though Agent Demlein testified at the suppression hearing that he was "100 percent [certain] that's him," again, this statement of certainty (particularly when it is

itself suspect) does not outweigh the significant evidence of unreliability.  (Suppr. Hr'g Tr. 47, 18-24, Jan. 27, 2005).

As for cross-examination as a cure, while questions by Smith's attorneys have effectively exposed the contradictions in Agent Demlein's testimony, those questions do not possess enough curative power to undo the "very substantial likelihood of misidentification" present in this case.

I therefore conclude that Agent Demlein's in-court identifications of Ramses Smith were both suggestive and unreliable.

### D.   __Additional Future In-Court Identifications__

The defendant has also moved to suppress any future in-court identification that Agent Demlein might make.  At least one other court in the First Circuit has considered a prospective motion to suppress future in-court identifications.  See Gomez Pizarro, 364 F. Supp. 2d at 67-68 (suppressing any future in-court identification when there was no evidence that such an identification would be reliable despite an earlier suggestive identification procedure).  In evaluating this motion, I am mindful of the Manson Court's admonition that "[j]uries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." Manson, 432 U.S. at 116; see also de Jesus-Rios, 990 F.2d at 678

(referring to "a case of minimal suggestivity that could have been cured at trial").

I share the <u>Manson</u> Court's confidence in the ability of jurors to evaluate the evidence before them, flaws and all.  I conclude, however, that any future in-court identification by Agent Demlein in this case would suffer from the same grave reliability problems that afflict the three identifications examined above.  As with the detention and suppression hearing identifications, cross-examination is an insufficient cure for these problems.  I therefore conclude that any future in-court identification by Agent Demlein is suppressed as well.

**IV.   <u>CONCLUSION</u>**

The First Circuit teaches that an identification should be suppressed only in "extraordinary circumstances."  <u>United States v. Watson</u>, 76 F.3d 4, 6 (1st Cir. 1996).  Agent Demlein's out-of-court photo identification of Ramses Smith -- all four versions of it -- as well as his two previous and any future in-court identifications, however, present just such a circumstance.

In the case at bar, the <u>Manson</u> dissenters' misgivings appear to have been borne out.  Justices Marshall and Brennan warned of the danger of identifications made by government agents "in highly competitive activities, such as undercover narcotics agents . . . ."  432 U.S. at 130.  In <u>Manson</u>, the undercover operation was a drug sting; here, Agent Demlein was working to

rid the streets of illegal firearms.  I applaud the goals of this operation, but am troubled by what appears to be, at best, extreme sloppiness and, at worst, manipulation of this Court in an agent's zeal to obtain a conviction.

I therefore **GRANT** the defendant's motion to suppress [docket entry #25] as to the out-of-court photo identification, the in-court identifications at the detention and suppression hearings, and any future in-court identification of Ramses Smith by Agent Demlein.[14]


**SO ORDERED.**

**Date:  May 8, 2006          /s/NANCY GERTNER, U.S.D.J.**

---

[14] This Memorandum and Order does not address any identifications of Ramses Smith that might have been made by the CW.